Maurice Harmon (MH-9051)
Harmon & Seidman LLC
The Pennsville School
533 Walnut Drive
Northampton, PA 18067
610.262.9288

_Attorneys for Plaintiff_
_Hilda Semerdjian_

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------X
                                                                       :
HILDA SEMERDJIAN,                                                       :
                                                                       :
       Plaintiff,                                                    :
                                                                       :
       v.                                                            :    07-CV-7496
                                                                       :    (LMM) (AJP)
MCDOUGAL LITTELL, A DIVISION OF                                         :
HOUGHTON MIFFLIN COMPANY, AND                                          :
R.R. DONNELLEY & SONS COMPANY,                                         :
                                                                       :
       Defendants.                                                   :
                                                                       :
-----------------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS COUNT IV OF PLAINTIFF'S COMPLAINT**

**PRELIMINARY STATEMENT**

       This is an action for copyright infringement under 17 U.S.C. § 101 _et seq_. (the

"Copyright Act" or the "Act") and common-law fraud under New York law, brought by

Hilda Semerdjian (the daughter and heir of artist Simon Samsonian ("Samsonian")) against defendant publisher McDougal Littell, a division of Houghton Mifflin Company ("McDougal") and defendant printer R.R. Donnelley & Sons Company ("Donnelley").

Plaintiff alleges that in 1998 Samsonian granted, in response to McDougal's specific request, limited licenses giving McDougal the right to publish and distribute copies of three different paintings, created by Samsonian, in a textbook with a print run of 40,000. Defendants, however, copied the paintings without Plaintiff's authorization more than 1.2 million times. The unauthorized use continues even to this day.

Plaintiff further alleges that at the time McDougal requested the licenses, it knew its actual use would greatly exceed 40,000 copies, but misrepresented its intentions in order to obtain the licenses at a lower cost than it would have paid had it been fair and honest in its dealings. Plaintiff's allegations are set forth in the Complaint filed on August 24, 2007.

On September 28, 2007, pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants filed a Motion to Dismiss Count IV of the Complaint, contending: (a) it is preempted under § 301 of the Act; and (b) it fails to state a claim on which relief can be granted under New York law because: (i) Plaintiff failed to plead pecuniary harm; and (ii) failure to comply with a license limitation does not state a claim for fraud. *See* Defs.' Mem. in Supp. at 2, 8, 11.

Plaintiff opposes the Motion to Dismiss on all grounds.

## LEGAL STANDARD

For the purposes of a Rule 12(b)(6) motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and accept the allegations of the

complaint as true. *Miller v. Tawil*, 165 F.Supp.2d 487, 490 (S.D.N.Y. 2001). Dismissal of the complaint is proper only where it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim that would entitle her to relief. *Id*. Further, "[a] motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *Walsh v. McGee*, 918 F.Supp. 107, 112 (S.D.N.Y. 1996).

### STATEMENT OF FACTS

Simon Samsonian (now deceased) was a full time professional fine art painter. Compl. ¶¶ 2, 8. In 1998, McDougal requested and received the right to reproduce three Samsonian paintings in a textbook, *The Language of Literature,* Grade 9 edition ("LOL"*)*. Compl. ¶¶ 9-10.[1] McDougal's requests and Samsonian's permissions were expressly limited to a print run of 40,000 copies of LOL. *Id.* At the time McDougal requested use of the paintings, however, it knew its actual use would greatly exceed 40,000 copies. Despite this knowledge McDougal deliberately misrepresented the number it needed in order secure the rights at lower licensing fees. Compl. ¶¶ 12-13. Samsonian relied upon McDougal's misrepresentations to his financial detriment. Compl. ¶¶ 11, 17.[2]

---

[1] The two requests, dated May 7, 1998 and October 27, 1998 respectively, are attached to the Complaint as Ex. D.

[2] The McDougal payment voucher, attached hereto as Ex. 1, indicates that an invoice for the licenses was generated on November 27, 1998 and that a check was issued to Samsonian on December 31, 1998. Both Ex. 1 and Ex. 2, *see infra* n.3, are properly attached hereto, since "[w]hen determining the sufficiency of plaintiffs' claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiffs' amended complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, *or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit*." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (emphasis added).

McDougal caused more than 1.2 million copies of LOL to be printed, displayed, distributed and sold, each containing copies of the paintings.  Compl. ¶ 18.  Donnelley printed all of these copies.  Compl. ¶ 19.[3]

McDougal defrauded and infringed the copyrights of many other artists, writers and photographers in the same manner and using the same tactics, *i.e.*, misrepresenting to the copyright holders that it was acquiring copying permissions for a print run significantly lower than its intended use.  Compl. ¶¶ 14-16.  These tactics provided McDougal access to the intellectual property of its licensors and, by entering into a license in the first instance, lulled the licensors into a false sense of security:  If the licensors came upon their work in a McDougal textbook they would assume such use was pursuant to a valid, bargained-for license.  Compl. ¶ 16.  Further, the licensing of a specific number of copies (*i.e.*, 40,000) created an expectation that if additional copies were needed, McDougal would request – and pay for – such use.  *Id*.  Through such pervasive fraudulent and infringing activities, Defendants have garnered millions of dollars in unjust profits, depriving thousands of copyright owners of their rightful compensation.  Compl. ¶ 15.  *See also* Defs.' Mem. in Supp. at 2, n.1.[4]

---

[3] The first infringing copy of LOL was delivered to McDougal on July 27, 1999, and would have been printed two to three weeks earlier.  *See* Diedrich Aff. ¶ 2 and spreadsheet, attached hereto as Ex. 2.  Ms. Diedrich, formerly McDougal's Director of Inventory, submitted this affidavit pursuant to a related lawsuit involving the Defendants and their publication of LOL.

[4] In their gratuitous footnote, Defendants provide a string citation of eight "similar pending actions filed by plaintiff's counsel."  Whether this is an attempt to sway this Court by implying that Plaintiff's counsel is overly litigious – a tactic that would seem frivolous at best and unethical at worst – or mere carelessness (as evinced by mistakenly including the instant action as one of the "others") is debatable.  Rather than Plaintiff's counsel being overly litigious, a more reasonable inference could be drawn that Defendants are, quite simply, overly infringing.

**ARGUMENT**

**I.    COUNT IV IS NOT PREEMPTED BY THE COPYRIGHT ACT.**

As Defendants correctly suggest in their Memorandum in Support, *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296 (2d Cir. 2004) sets forth the controlling law of this circuit with respect to whether the Act will preempt a state law claim:

> The Copyright Act exclusively governs a claim when: (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act …  and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law….

*Briarpatch* at 305 (internal citations omitted).

Defendants conveniently ignore, however – or in one case, consign to a footnote – the subsequent language of *Briarpatch* that provides the framework for a preemption analysis and, equally conveniently, decline to apply that analysis to the facts of this case.[5]

"The first prong of this [exclusivity] test is called the 'subject matter requirement,' and the second prong is called the 'general scope requirement.'" *Id.* While Plaintiff does not concede that the subject matter requirement is met with respect to the three Samsonian paintings, the general scope requirement is clearly not satisfied.[6] "The

---

[5] Despite Defendants' consistent tendency to ignore any judicial opinion that does not comport with their narrow – and novel – legal theories, such opinions do exist and help elucidate the issues raised by this Motion.

[6] *See Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004) ("The subject matter requirement is satisfied if the claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works."). While it is not clear that Plaintiff's *fraud* claim necessarily applies to Samsonian's works, research has not discovered any court decisions addressing the issue. For this reason – and because the general scope requirement is not met – Plaintiff does not argue the point here.

5

general scope requirement is satisfied only when the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law. In other words, the state law claim must involve acts of reproduction, adaptation, performance, distribution or display." *Id*. (citations omitted). As a threshold issue, it is patently obvious that the common-law fraud pleaded in Count IV in no way involves acts of reproduction, adaptation, performance, distribution or display; these actions speak to Plaintiff's infringement claims only.

This, however, does not end the analysis. Courts in this circuit determine whether the general scope requirement is satisfied by applying the "extra element" test *Briarpatch* at 305-06; *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992) ("But if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie within the general scope of copyright, and there is no preemption.") (internal quotations omitted); *Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 200 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985) ("Conversely, when a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur.").

Further, the extra element must render the state claim "qualitatively different" from the copyright claim in order to avoid preemption. *Briarpatch* at 305. "To determine whether a claim is qualitatively different, we look at what the plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced." *Briarpatch* at 306 (internal citations and quotations omitted). The task

before this Court, then, is to determine whether Plaintiff's common-law fraud claim contains any extra element that makes her claim qualitatively different from her infringement action.

A recent decision in this District is directly on point. In *Integrative Nutrition, Inc. v. Academy of Healing Nutrition*, 476 F.Supp.2d 291 (S.D.N.Y. 2007), plaintiff initially brought an action in New York state court, alleging, *inter alia*, that defendants "had fraudulently obtained and illegally used the plaintiff's 'intellectual property.'" *Id.* at 293. Defendants removed the case to federal court and subsequently filed a 12(b)(6) motion to dismiss on the ground that plaintiff's claims were preempted by the Act. *Id.*

After applying the *Briarpatch* analysis, the court determined that all of plaintiff's claims met the subject matter requirement and that some claims also met the general scope requirement; those that did were preempted. Judge Koeltl nevertheless held that plaintiff's claim of fraud and misrepresentation was *not* preempted:

> [T]he fraud claim contains, at the very least, the additional element of "intentional deception," which renders it qualitatively different from a claim for copyright infringement. ... Professor Nimmer has stated that "there is no preemption of the state law of fraud." 1-1 Nimmer on Copyright, § 1.01[B][1][e]. For these reasons, the plaintiff's second cause of action for fraud is not preempted by the Copyright Act.

*Integrative Nutrition* at 298. *See also Tracy v. Skate Key, Inc.*, 697 F.Supp. 748, 751 (S.D.N.Y. 1988) ("[P]laintiff's claim for fraud contains an element of misrepresentation that is irrelevant to the cause of action for copyright infringement. Consequently, this cause of action is … not preempted by the Copyright Act.").

As noted treatise author William J. Patry points out:

> [A]s with all state claims, claims of fraud must be measured against the qualitatively different-in-kind test. Where fraud is stated as an independent claim, courts consider misrepresentation to be the element

that distinguishes fraud from copyright infringement and on that basis, automatically assume there is no preemption. A few have held fraud claims preempted based on a finding that the plaintiff was pleading a straight copyright infringement claim in state law clothes. Occasionally (and helpfully), courts point to specific conduct that does appear to be qualitatively different in nature from copyright infringement.[7]

5 Patry on Copyright § 18:37 (2007).[8]

Similarly, in *Brignoli v. Balch Hardy and Scheinman, Inc.*, 645 F.Supp. 1201 (S.D.N.Y. 1986), the Court held that although plaintiff's claims fell within the ambit of the subject matter requirement, they were nevertheless qualitatively different and thus were not preempted by the Act. "Pre-emption will not occur 'when a state law violation is predicated upon an act incorporating elements beyond mere reproduction and the

---

[7] *See also* cases cited therein, including: *Lattie v. Murdach*, No. C-96-2524, 1997 WL 33803, at *5 (N.D. Cal. Jan. 9, 1997) ("The fraud claim includes allegations that plaintiff relied on defendants' misrepresentations and that defendants refused to compensate him for the use of the materials as promised"; claim not preempted); *Korman v. Iglesias,* 736 F.Supp. 261, 264 (S.D. Fla. 1990) ("In other words, plaintiff does not contend that defendant sought to infringe her copyright, but that he falsely induced her to perform work for him that she would not otherwise have done – a qualitatively different claim which the Copyright Act does not preclude"; claim not preempted); *Pick v. Pikoff*, No. Civ.A. 3:04-CV-0170B, 2004 WL 2997480, at *3 (N.D. Tex. Dec. 27, 2004) ("Plaintiff asserts he was fraudulently induced into signing the contract at issue, which requires proof of a false representation by Defendants that was relied upon by Plaintiff. Again, these elements are not present in a copyright infringement claim and distinguish this state law cause of action from a copyright preempted claim.") (internal citations omitted).

[8] Patry appears to disfavor "automatic" findings of non-preemption based on the mere existence of a material misrepresentation and cites *Integrative Nutrition, Inc. v. Academy of Healing Nutrition*, 476 F.Supp.2d 291 (S.D.N.Y. 2007) as an example. A careful reading of *Integrative Nutrition*, however, suggests that the "qualitatively different-in-kind" analysis was properly applied. "[T]he plaintiff claims that the defendants obtained access to Integrative Nutrition's intellectual property through fraud and misrepresentation…." *Id.* at 294. That access was obtained long before any infringement of Integrative Nutrition's intellectual property occurred, giving rise to a state law claim distinct from any copyright infringement action. One can infer that had the defendants in *Integrative Nutrition* properly identified themselves as competitors intending to steal the plaintiff's intellectual property, the plaintiff would have taken appropriate steps to fend off the attempt. So too would Samsonian have taken steps (by insisting on a higher licensing fee) had he known that McDougal intended to exceed the terms of the licenses.

like.'"  *Id*. at 1205 (quoting *Harper & Row Publishers*, 723 F.2d at 200).  Specifically, plaintiff's common-law fraud claim under the laws of the State of New York was not preempted because it involved the extra element of misrepresentation.  *Brignoli* at 1205.

In her Complaint, Plaintiff's core allegations of fraud are: (1) on at least two occasions (May 7, 1998 and October 27, 1998, when McDougal requested permission to use the three Samsonian paintings), material, false representations were made by McDougal to Samsonian with respect to the number of copies of LOL that McDougal intended to print; (2) on both these occasions, McDougal knew its representations to Samsonian were false; (3) the misrepresentations were made with the intent to defraud Samsonian; (4) Samsonian reasonably relied on McDougal's misrepresentations in negotiating a licensing fee for use of the paintings; and (5) the $300 Samsonian received for the licenses was less than he ordinarily would have demanded had he been informed of the true number of copies of LOL that McDougal planned to print.  Compl. ¶¶ 10-13, 17, Compl. Ex. D, Ex. 1.  The elements of this common-law fraud claim[9] are not merely part of a "laundry list" to avoid preemption under the Act, as Defendants assert.  Defs.' Mem. in Supp. at 7, n.3.  Rather, they are central to Plaintiff's argument that the common-law tort of fraud, as perpetrated by McDougal on her father, is separate and distinct from the Defendants' infringement of her copyrights; and that the fraud was completed before LOL was even published, let alone her copyrights infringed.  Since Plaintiff's claim of fraud arises from a separate core of facts requiring distinct elements

---

[9] Under New York law, to prove common-law fraud, "a plaintiff must show (1) that there was a material, false representation, (2) made with knowledge of its falsity, and (3) an intent to defraud (4) that plaintiff reasonably relies on, (5) causing the plaintiff damages."  *Kregos v. Associated Press*, 3 F.3d 656, 665 (2d Cir. 1993).

of proof and since her claim seeks to vindicate rights not contemplated by the Act, it passes the "qualitatively different-in-kind test" and is thus not preempted by the Copyright Act.[10]

Defendants' attempts to find support for their preemption argument miss the mark. For example, Defendants cite *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 186 F.Supp. 2d 592 (D. Md. 2002) for the simple – and undisputed – proposition that "[r]eframing copyright claims as state law fraud claims to evade the remedial framework of the Copyright Act has been repeatedly prohibited." Defs. Mem. in Supp. at 3. *Lowry's Reports* is factually distinguishable in a critical way. There, the defendant, without any fraudulent or deceptive representations, simply purchased a single subscription of plaintiff's work. Once defendant obtained the copyrighted work pursuant to this subscription, it unlawfully reproduced the copyrighted material. There were no misrepresentations in *Lowry's Reports*. Thus, the court properly found the fraud claim preempted.

Here, in contrast, McDougal made misrepresentations in order to *acquire* Plaintiff's work in the first instance, to create the impression that it was legitimately

---

[10] Defendants as much as concede this crucial point (albeit inadvertently): "Had McDougal been an intentional infringer and sought no license, making no alleged misrepresentation, plaintiff would the same injury [sic], and a claim for infringement of the entire number of copies (intent not being an element of infringement or relevant to actual damages), with damages measured by the fee that a reasonable licensee [sic] should have been paid." Defs.' Mem. in Supp. at 9. Leaving aside Defendants' tortured syntax and confused suffixes, their parenthetical comment is telling: Intent is *not* an element of a copyright infringement claim. Intent *is*, however, an integral prong of a common-law fraud claim. *See supra* n.9; Goldstein on Copyright, 3rd ed., § 17.2.1 at 14-15 ("Nor will Section 301 preempt a state law fraud claim that asserts the extra element of misrepresentation. Courts applying the extra element test have consistently looked to the substance rather than the form of the state law claim.")

licensing the work as needed, and to pay less than it would have paid had it been honest. In other words, the deception preceded the infringement. Unlawful reproduction did not occasion the fraud.

Defendants' later cite *Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225 (4th Cir. 1993) and *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923 (7th Cir. 2003), for essentially the same proposition: To the extent that a claim of fraud is based on defendant's unauthorized copying of plaintiff's copyrighted work, the fraud claim will be preempted, even if there has been intent to infringe. *Rosciszewski* at 230; *Bucklew* at 933-34. Plaintiff's fraud claim, however, is *not* based on Defendants' unauthorized copying but clearly rests on a core of facts separate and distinct from that copying. And because the issue of intent relates only to the fraud claim and not the copyright infringement claims, these cases are inapposite.[11] Neither *Rosciszewski* nor *Bucklew* (nor any other case cited by Defendants) sets forth a bright-line rule that all fraud claims are preempted by the Act as a matter of law.[12] Both stand for nothing more than the undisputed legal "qualitatively different-in-kind" standard explained in *Briarpatch*.

---

[11] In *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923 (7th Cir. 2003), Judge Posner added a twist to the traditional analysis of the extra element test. As explained by a leading treatise author: "The key to Judge Posner's opinion is his statement that the damages plaintiff sought were identical to the damages that arose from the acts constituting copyright infringement; in essence, the same acts gave rise to the same damages and hence in that case the fraud claim was merely a relabelled copyright infringement claim. Where the damages are different, there is no preemption." 5 Patry on Copyright § 18:21, n.7 (2007). Whether Judge Posner's analysis is correct, however, is moot: In her fraud claim, Plaintiff seeks damages different from those sought in her copyright infringement claims, based on acts different from Defendants' infringement of her copyrights. Compl. at 7 (prayer for relief #4). *See* discussion *infra* of *Johnson v. Arista Holding, Inc.*, No. 05 Civ. 9645, 2006 WL 3511894 (S.D.N.Y. Dec. 5, 2006).

[12] Such a bright-line rule would come as a surprise to Congress, *see* H.R. Rep. 1476, 94th Cong., 2d Sess. 132 (1976) (mentioning fraud as not being preempted as long as the

11

Similarly, in *Johnson v. Arista Holding, Inc.*, No. 05 Civ. 9645, 2006 WL 3511894 (S.D.N.Y. Dec. 5, 2006) plaintiff's fraudulent inducement claim was deemed preempted by the Act because the claim merely "vindicate[d] the same rights as plaintiff's copyright claims." *Id*. at *7. Preemption was appropriate because the claim of fraudulent inducement was premised on plaintiff's expectation that he would receive only producer credit and royalties. *Id*. In other words, the rights sought to be vindicated were precisely the same rights protected by the Act. The plaintiff admitted as much by seeking "only producer credit, fees, and royalties *stemming from the exploitation of [his] contribution....*" *Id*., n.10 (emphasis added). Put another way, if the alleged copyright infringement in *Johnson* had never taken place, no pecuniary harm would have come to the plaintiff.

The same cannot be said in this case. To be sure, Samsonian and/or his heir suffered pecuniary harm at the time the first infringing copy of LOL was published, *i.e.*, at the time copy #40,001 rolled off the presses; and they continued to suffer pecuniary harm for copies #40,002 through #1,200,000 and beyond. Quite separate from that harm, however, is the harm Samsonian suffered *in 1998* as a result of McDougal's fraud. This wrong was perpetrated more than six months *before* Defendants first infringed Plaintiff's copyrights.[13]

_____

claim contains elements that are "different in kind from copyright infringement"), dozens (if not hundreds) of jurists whose opinions hold otherwise, as well as the three most prominent copyright scholars: Nimmer, Patry and Goldstein.

[13] This time frame is based on Plaintiff's assertion that the fraud was constructively completed when McDougal's check was issued on December 31, 1998 and that the first infringing copy was printed sometime in early July 1999.

A brief hypothetical illustrates the point:  Assume, for the sake of argument, that Samsonian granted the licenses for 40,000 copies in 1998 but that sometime in 1999 McDougal decided it no longer wanted to use the three paintings or, perhaps, that LOL was never even going to be published.  Under these facts, there would have been no copyright infringement.  Further assume that Plaintiff later discovered that McDougal had, in 1998, *intended* to print and distribute 1.2 million copies and not the 40,000 copies negotiated and paid for.  Even without copyright infringement, there would have been a colorable state cause of action for fraud.  A misrepresentation of material fact, false and known to be false by McDougal, would have been made for the purpose of inducing reliance by Samsonian, which caused justifiable reliance to Samsonian's pecuniary harm.[14]  It defies both law and logic to think that a fraud claim would have been dismissed merely because Defendants did not infringe any copyrights.

Nothing in this hypothetical fact pattern, or in the actual facts of this case with respect to the fraud claim, "involve acts of reproduction, adaptation, performance, distribution or display."  *Briarpatch* at 305.  The fraud, as perpetrated by McDougal, was a discrete tort, comprised of at least one qualitatively different extra element, separate from – and occurring before – any copyright infringement, thus rendering preemption inappropriate.  Defendants appear to be inviting this Court to accept a premise that would immunize them against claims of fraud by sleight of hand:  "As long as we admit to infringement," they seem to be saying, "we cannot be held responsible for fraud."  It is an invitation this Court should decline.

---

[14] The licenses were not executory contracts:  Nothing in the licenses predicated payment on actual use of the paintings.  Rather, McDougal requested "permission to use" the paintings, Compl. Ex. D, and that permission was granted by Samsonian for a fee – a fee that would have been higher had McDougal negotiated in good faith.

II.     **COUNT IV ADEQUATELY STATES A CLAIM FOR FRAUD.**

Defendants presents two arguments in support of their contention that Count IV should be dismissed for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).

A.     **PLAINTIFF HAS PLEADED PECUNIARY HARM AND ALL OTHER ELEMENTS OF FRAUD.**

Defendants first inaccurately assert that Plaintiff never pleaded pecuniary harm. Second, they cite three cases that state the wrong standard of review.  Third, they offer a lengthy disquisition conflating an adequately pleaded claim of common-law fraud with a never-pleaded contract claim. And fourth, they conclude with the misstatement that Plaintiff seeks to "turn the theory of damages underlying the Copyright Act on its head, treating those who (insufficiently) license more punitively that [sic] those who fail to license at all."  Defs.' Mem. in Supp. at 11.  These arguments fail.

The heightened pleading standard as set forth in the Federal Rules of Civil Procedure requires that in any averment of fraud, "the circumstances constituting fraud … shall be stated with particularity."  Fed. R. Civ. P. 9(b).  Further, "[f]or the purpose of testing the sufficiency of a pleading, averments of time and place are material and shall be considered like all other averments of material matter."  *Id*.  9(f).  This pleading standard is meant to give defendants "fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Ross v. A.H. Robins Co., Inc*., 607 F.2d 545, 557 (2d Cir. 1979).  "It is the pleading of these matters with precision that serves the rule's purpose by apprising the defendant of the claim against him and of the acts relied upon as constituting the fraud charged."  *Id*.  "The rule thus obligates a plaintiff to "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the

14

speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Henneberry v. Sumitomor Corp. of America*, No. 04 Civ. 2128, 2007 WL 2068346, at *15 (S.D.N.Y. Jul. 12, 2007).

The following allegations, which must be taken as true, show Plaintiff has adequately met her burden:

"In 1998 McDougal requested permission to copy and print 40,000 copies of [the three Samsonian paintings] in [LOL].  Samsonian granted McDougal the requested use and charged a reproduction fee based on 40,000 copies."  Compl. ¶ 10.

"Samsonian was induced to grant McDougal's request because of McDougal's misrepresentation to him that it was seeking permission 'for a print run of 40,000.'" Compl. ¶ 11.

"At the time it represented to Samsonian a need for 40,000 copies of his paintings, McDougal knew its actual use would greatly exceed that number."  Compl. ¶ 12.

"McDougal intended by its misrepresentation to obtain access to the paintings at a lower cost than it would have paid had it been honest in its dealings with Samsonian." Compl. ¶ 13.

"McDougal fraudulently concealed its wrongdoing by throwing licensors, including Samsonian, 'off the scent.'"  Compl. ¶ 16.

"Samsonian relied to his detriment on the truthfulness of McDougal's request for 40,000 copies in setting the reproduction fee for McDougal."  Compl. ¶ 17.

"Plaintiff suffered damages as a result of McDougal's fraud."  Compl. ¶ 31.

Additionally, "[E]xhibit D sets forth the identity of the persons making the misrepresentation, the time, place and content of the misrepresentation, and the method

by which the misrepresentation was communicated to Samsonian, and the statements set forth therein are hereby incorporated as if fully set forth in this paragraph." Compl. ¶ 11.

Taken as a whole, therefore, Plaintiff's Complaint expressly and specifically alleges all elements of a claim of common-law fraud. *See supra*, n.9. It details, with sufficient particularity, the statements or omissions that Plaintiff contends are fraudulent, the identity of the speaker, where and when the statements or omissions were made, and why the statements or omissions are fraudulent.[15]

Yet Defendants maintain that Plaintiff "has not pled, and given the facts pleaded cannot plead, pecuniary harm resulting from her reliance on a fraudulent misstatement." Defs.' Mem. In Supp. at 8. Pecuniary harm, however, equals "damages," as Plaintiff uses the term, and damages are defined as: "Money claimed by … a person as compensation for loss or injury." Black's Law Dictionary 393 (7th ed. 1999).

Defendants cite *Abernathy-Thomas Eng'g Co. v. Pall Corp.*, 103 F.Supp.2d 582 (E.D.N.Y. 2000), *Nakano v. Jamie Saddock, Inc.*, No. 98 CIV. 0515, 1999 WL 1225259 (S.D.N.Y. Dec. 20, 1999) and *Mom's Bagels of N.Y., Inc. v. Sig Greenebaum, Inc.*, 559 N.Y.S.2d 883 (N.Y. App. Div. 1990) in support of their argument that fraud is

---

[15] In a related case involving the same Defendants and LOL, Defendants made a similar argument, and failed. In *Bergt v. McDougal Littell, a division of Houghton Mifflin Company, and R.R. Donnelley & Sons Company*, No. 06 C 4645, 2006 WL 3782919 (N.D. Ill. Dec. 21, 2006), Defendants, as here, argued on a 12(b)(6) motion to dismiss that plaintiff Bergt "has not stated a claim for common-law fraud because the amended complaint fails to allege either a false statement of material fact or justifiable reliance on that false statement." *Id.* at *4. The court rejected Defendants' arguments. "In this case, the amended complaint specifically alleges that McDougal falsely represented that it sought to use the painting in the textbook for a print run of 40,000, when in fact it knew at the time that it made that representation that its actual use would greatly exceed that number. The amended complaint further alleges that as a result of that false representation, Bergt was induced to grant McDougal a limited license for $200. Together, these allegations are sufficient to state a claim for fraud as they allege both a misrepresentation of material fact and justifiable reliance." *Id.*

inadequately pled.   Each of these cases, however, deals with a Rule 56 summary judgment motion, not a motion to dismiss under Rule 12.  This distinction is crucial.  In a Rule 12 motion to dismiss, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995).  In other words, "[t]he purpose of a Rule 12(b)(6) motion is to test the 'legal feasibility of the complaint,' not the weight of the evidence that might be offered to support it, [as is the case on a motion for summary judgment]."  *Access 4 All, Inc. v. Trump Intern. Hotel and Tower Condominium*, 458 F.Supp.2d 160, 164 (S.D.N.Y. 2006).  *See also McSpadden v. Caron*, No. 03-CV-6285, 2004 WL 2108394, at *7 (W.D.N.Y. Sep. 20, 2004) (denying a motion to dismiss, noting that defendant cited and relied on a case involving summary judgment in its 12(b)(6) motion).

Defendants' fourth case, *Universal Builders Supply, Inc. v. Bayly, Martin & Fay, Inc.*, 540 N.Y.S.2d 539 (N.Y. App. Div. 1989) is marginally more appropriate, but distinguishable.  *Universal Builders* involved an insurance broker who, according to plaintiff, failed to endorse his policy with the language "not under New York supervision and not protected, in the event of insolvency of the insurer, by the Property/Casualty Insurance Security Fund."  *Id.* at 540.  The court found no causal connection between defendant's oversight and the damages suffered, because the accident giving rise to the complaint occurred in another state.  So it ruled that if the policy had been properly endorsed, plaintiff would not have been covered.  "This theory of recovery is, as a matter of law, too speculative and indeterminable to support the claim of injury."  *Id.* at 541.  But the same cannot be said here because Plaintiff specifically alleges in her Complaint

that she suffered actual pecuniary harm as a direct result of Defendants' fraudulent actions.

Next, Defendants rely on *Kregos v. Associated Press*, 3 F.3d 656 (2d Cir. 1993), for the rule that "[a]ctual pecuniary losses [for fraud under New York law] must be the direct, immediate, and proximate result of the misrepresentation. The damages must also be independent of other causes." *Id*. at 665. Continuing, Defendants argue that "[p]laintiff's pecuniary injuries were, if any, the result of the infringement complained of and nothing more – the copies allegedly made without license – not the product of detrimental reliance on any alleged fraud." Defs'. Mem. in Supp. at 9. Defendants again miss the mark. The damages suffered by Plaintiff *with respect to the fraud claim* are the direct, immediate and proximate result of Defendants' misrepresentations and not, as Defendants assert, the result of "nothing more" than the infringement. As previously explained in Part I of this Memorandum in Opposition, the damages occurred *before any infringement took place* and would have occurred even had no infringement ever taken place.[16]

Defendants next seem to argue that *Kregos* precludes Plaintiff's fraud claims because "New York law awards only 'out-of-pocket' expenses in fraud cases." 3 F.3d at 665. This argument, however, merely speaks to the *level* of damages and not their nature or their cause. Plaintiff has adequately pled that McDougal's fraudulent inducement was the proximate cause of Samsonian's failure to negotiate a fair licensing agreement. *See,*

---

[16] Additionally, the District Court decision in *Kregos* made clear that "Plaintiff has not stated an independent claim of fraud but merely reformed one of his arguments offered for tolling the three-year statute of limitations for one of his copyright claims, an argument we have already found unconvincing." *Kregos v. Associated Press*, 795 F.Supp. 1325, 1335 (S.D.N.Y. 1992).

*e.g., Barrett v. Huff*, 776 N.Y.S.2d 678, 681 (N.Y. App. Div. 2004) (discussing out-of-pocket damages rule). *Kregos* does not preclude Plaintiff from alleging (now) and proving (later) that any damages arising from alleged fraud would *not* be wholly duplicative of the damages attributable to the infringement. This is essentially the same argument raised earlier by Defendants and fails for the same reason: Plaintiff's damages attributable to Defendants' fraud were suffered irrespective of whether any infringement (or breach of contract) occurred.

Defendants next devote a page of their argument addressing a putative breach of license claim, which was never pleaded in the first instance. Defs.' Mem. in Supp. at 10. Plaintiff has not contended that McDougal failed to pay $300 for the licenses, or that it failed to disclose its intent to breach them.[17] Subsequent to licensing, copyright infringement occurred.[18] Prior to that, however, McDougal made material misrepresentations it knew to be false that Samsonian relied on to his pecuniary detriment. In other words, fraud was committed.

---

[17] Defendants' reliance on *TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 90 (2d Cir. 2005) ("the failure to disclose an intention to breach is not actionable as a fraudulent concealment") is misplaced. The law on this issue is not clear. *See* Peter A. Alces, The Law of Fraudulent Transactions § 2.25 at 35 (2006) (discussing ambiguity in New York law: "Other courts, however, have allowed a fraud claim when there was no present intent to perform."). *See also Deerfield Communications Corp. v. Cheseborough-Ponds, Inc.*, 502 N.E.2d 1003, 1004 (N.Y. 1986) (refusing to dismiss fraud claim alleging a misrepresentation of present fact, not of future intent, which representation was collateral to, but which was the inducement for, the contract and "thus not duplicative of contract claim" (citations and internal quotation marks omitted). Thus, even if there were a contract claim in issue, Defendants' Motion to Dismiss must be denied.

[18] On this point, and on this point only, would the three cases cited and quoted by Defendants, *Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352 (6th Cir. 2007), *Jarvis v. K2, Inc.*, 486 F.3d 526 (9th Cir. 2007) and *On Davis v. The Gap, Inc.*, 246 F.3d 152, 172 (2d Cir. 2001) have any relevance, as they speak to the measure of damages in a copyright infringement action.

Defendants conclude their Section B with the statement that Plaintiff seeks to "turn the theory of damages underlying the Copyright Act on its head, treating those who (insufficiently) license more punitively that [sic] those who fail to license at all." Plaintiff has alleged that in its requests for the limited licenses, McDougal intended to "obtain access to the paintings" it would otherwise not have had, Compl. ¶ 13, and to "[lull] licensors into a false sense of trust." Compl. ¶ 16. For these reasons McDougal's wide-spread, intentional, misrepresentations should be treated more punitively than use without a license. "Under New York law, punitive damages are appropriate in cases involving gross, wanton, or willful fraud or other morally culpable conduct. Such conduct need not be directed at the general public." *Fraternity Fund Ltd. v. Beacon Hill Asset Management LLC*, 376 F.Supp.2d 385, 412 (S.D.N.Y. 2007). Regardless, Plaintiff need not show that McDougal's fraudulent conduct was worse than either its copyright infringements or any putative breach of contract … just that it was different.

## B.    CLAIM IV IS MORE THAN A CLAIM FOR FAILURE TO COMPLY WITH A LICENSE.

Section C of Defendants' Memorandum in Support is nothing more than a continuation of their Section B, arguing that Plaintiff's Claim IV lies in contract, not in fraud. They present no new legal insight and this section, therefore, requires little further argument.

> [O]ne who makes a contractual promise with the undisclosed intention to breach it can be held liable for fraud, [provided that] proof of such intention [is] based on more than a showing of nonperformance. [Plaintiff's] allegations that [defendants] deliberately omitted from the Agreement compensation to be paid to him and crafted the document to frustrate the possible enforcement of plaintiff's claims, constitute more than a mere showing of nonperformance.

*Brignoli*, 645 F.Supp. at 1208.  *See also MCI Worldcom Comms., Inc. v. North Am. Comms. Control, Inc.*, No. 98 Civ.6818, 2003 WL 21279446, at *9 (S.D.N.Y. Jun. 4, 2003) ("Where courts have found viable fraud claims based on fraudulent misrepresentation, the statements concerned matters separate and distinct from the subject matter of the contract.").

Ultimately, the gravamen of Defendants' argument appears to posit the rhetorical question: "Why should Plaintiff be permitted to paint a simple breach of action claim as one of fraud?"  To this, Plaintiff responds in the reverse:  Why should Defendants be permitted to escape liability, in a Rule 12(b)(6) Motion to Dismiss, for alleged fraudulent activity by claiming it's a simple breach of contract?

## CONCLUSION

For all the foregoing reasons, Defendants' Motion to Dismiss Count IV of Plaintiff's Complaint should be denied.

Dated: October 12, 2007

<div style="margin-left:40%">

Respectfully submitted,

Plaintiff Hilda Semerdjian
by her attorney,

s/Maurice Harmon
Maurice Harmon #9419
Harmon & Seidman LLC
The Pennsville School
533 Walnut Drive
Northampton, PA 18067
Telephone (610) 262-9288
Fax (610) 262-9288
E-mail: maurice@mauriceharmon

</div>

SERVICE LIST (CM/ECF)

I hereby certify that on October 12, 2007, I caused the foregoing PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNT IV OF PLAINTIFF'S COMPLAINT to be electronically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent by operation of the court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the court's electronic filing system.

s/MauriceHarmon
Maurice Harmon (MH9051)
HARMON & SEIDMAN LLC
Attorneys for Plaintiff
The Pennsville School
533 Walnut Drive
Northampton, PA 18067
Telephone 610-262-9288
Fax 610-262-9288
maurice@mauriceharmon.com